UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERARDO HERNANDEZ,<br><br>Plaintiff,<br><br>v.<br><br>CALIBER BODYWORKS LLC, et al.,<br><br>Defendants. | Case No. 21-cv-05836-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 24 |

Plaintiff Gerardo Hernandez ("Plaintiff" or "Hernandez") filed this action against Defendants Caliber Bodyworks LLC ("Caliber") and Kristina Murti, trustee of the Duane B. Busch Charitable Remainder Unitrust ("Murti")[1] (collectively, "Defendants"), alleging that Defendants' facility, an automotive repair shop, did not have accessible parking or an accessible loading area. *See* Docket No. 19 ("FAC").  Hernandez alleges that Defendants violated Title III of the Americans with Disabilities Act, California's Unruh Civil Rights Act, and the California Health and Safety Code.  Pending before the Court is Defendants' motion to dismiss Hernandez's FAC, which the Court converted into a motion for summary judgment. *See* Docket No. 30.  For the reasons given below, the Court **GRANTS** Defendants' motion for summary judgment.

**I.     BACKGROUND**

A.     Factual Background

On April 27, 2021, Hernandez visited Caliber Collision, located at 123 California Drive in Burlingame, California (the "Facility"), which is owned and operated by Caliber.  FAC ¶¶ 1, 10.

---

[1] Murti is the landlord based on an agreement dated July 29, 1990.  Docket No. 25 at 1 n.1.

Hernandez lives less than thirty miles from the Facility. *Id.* ¶ 10. He is "substantially limited in his ability to walk, and must use a wheelchair for mobility." *Id.* ¶ 8. Before his visit, he had called ahead to schedule an appointment to receive an estimate for repairs to his vehicle and was told that he should park near the entrance. *Id.* ¶ 10. When he arrived, he allegedly "entered the Facility's driveway and found a parking lot, with several parked vehicles near the Facility entrance" but he "could not locate any designated accessible parking spaces in the Facility's parking lot, nor did he see an accessible loading area in which to transfer to his wheelchair." *Id.* He alleges that the street in front of the Facility was full of parked cars and so he could not have unloaded from his vehicle there. *Id.*

Instead, Hernandez "had to unload from his vehicle while parked in the driveway, which made him feel rushed as he did not know whether other cars might come in or out of the driveway." *Id.* He alleges that the "Facility staff witnessed [him] unloading from his vehicle, and did not stop or direct him to another location to park and unload." *Id.* The staff then took his keys and took his vehicle in for inspection for approximately 45 minutes. *Id.* He claims that "the Facility provides parking and/or a loading area to able-bodied customers, but does not offer an accessible alternative for wheelchair users such as a designated accessible parking stall or accessible loading zone, denying wheelchair users the ability to safely drop off their vehicles for service or estimates." *Id.*

Caliber's Regional Manager, Douglas Marey and Caliber's General Manager, Jonathan Cayabyab testified that the Facility's driveway is not for customer parking. Docket No. 41-1 ("Marey Depo.") at 9 ("There is no parking of vehicles on the property. There is only staging areas of repair phases."); Docket No. 41-2 ("Cayabyab Depo.") at 21, 23 ("The driveway is not for customer parking."). Instead, the "right side of the Facility's driveway is for vehicles that are in phases of repair, such as preparing to go into the paint process, preparing to go to the body process, or waiting for parts in the reassembly process." Docket No. 41 at 2 (citing Marey Depo. at 9–10; Cayabyab Depo. at 13, 24, 27). Both managers testified that Caliber employees park the customers' cars on the right side of the driveway as they await the next repair phase and then they are moved in and out of the shop. Marey Depo. at 10 ("Q. Who places those cars in that location

2

[on the right side of the driveway]?  A. Various employees, whether they're in the paint department, body department, detail department would park them there throughout the repair phases."); Cayabyab Depo. at 20–21 ("the driveway is for employees to move cars in and out of the shop").  Caliber also keeps the cars on the right side of the driveway so a tow truck has easy access to pick up a car after the insurance company determines that the car is a total loss.  Cayabyab Depo. at 13–14 ("Q. And why are these parked on the right-hand side of the driveway?  A. They're non-driven vehicles . . . [which] [m]eans it's total loss vehicles . . . we [also] keep them there so the tow truck has easy access to pick them up . . . once the estimate is complete and estimates sent up to the insurance company and they determine whether it is a total loss.").  The right side of the driveway is usually filled with cars and, if a spot opens, a Caliber employee will pull another vehicle into that spot.  *Id.* at 22, 28, 30.

Hernandez hired two private investigators to observe the Facility.  On January 24, 2022, Robert Ferris observed the Facility.  Docket No. 42-5 ("Ferris Decl.") ¶ 4.  On February 23, 2022, Fred Kim surveilled the Facility and on March 1, 2022, Kim acted as a customer and arrived at the Facility with a manual wheelchair to obtain an estimate for vehicle repairs.  Docket No. 42-6 ("Kim Decl.") ¶ 10.

B.  Procedural Background

On July 29, 2021, Hernandez filed the Complaint against Defendants, alleging violations of (1) Title III of the Americans with Disabilities Act ("ADA"); (2) California's Unruh Civil Rights Act (the "Unruh Act"); and (3) the California Health and Safety Code.  Docket No. 1.  On October 29, 2021, Caliber filed a motion to dismiss the Complaint but on November 11, 2021, Hernandez filed his First Amended Complaint ("FAC").  Docket. No. 19 ("FAC").  On November 26, 2021, Caliber filed the present motion to dismiss the FAC.  Docket No. 24 ("Mot.").  The motion hearing took place on January 6, 2022.

On January 18, 2022, the Court converted Caliber's motion to dismiss into a motion for summary judgment.  Docket No. 30 ("Order").  After the motion hearing and reviewing the Google Street View Images, *see infra* Part III.A.1.a, the Court decided that the only factual dispute

was whether the right side of Caliber's driveway is used for customer parking.[2] The Court therefore allowed discovery solely on this narrow question. *Id.* On January 31, 2022, Defendant Murti joined Caliber's motion to dismiss as well as the other briefs filed by Caliber in connection with the motion. Docket No. 37. After a discovery dispute about the scope of permissible discovery, the Court reiterated the narrow scope of discovery. Docket No. 40. Hernandez completed his discovery by March 10, 2022. *See* Docket No. 40. On March 24, 2022, the parties filed their supplemental briefs on summary judgment, at which time the matter was deemed submitted. Docket Nos. 41, 42.

## II. APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

## III. DISCUSSION

A. Title III of the ADA

Hernandez claims that Defendants violated Title III of the ADA because they failed to provide an accessible parking stall or passenger loading zone where he could unload from his vehicle into his wheelchair. FAC ¶ 10; Opp. at 3.

---

[2] As seen in the Google Street View images below, the left side of the driveway could not be used for customer parking because it would block the entrances into the garage. *See infra* Part III.A.1.a. In the photos, the middle lane is always empty and the back of the driveway is another entrance to the garage. Only the right side of the driveway was full of "parked" cars in the images. Therefore, the Court only questioned whether the right side of the driveway is used for customer parking.

4

1. Design Claims

Hernandez asserts that Defendants violated the ADA because they failed to (1) remove architectural barriers in its facility; (2) design and construct an accessible facility; (3) make an altered facility accessible; and (4) maintain accessible features. *Id.* ¶¶ 16–28, 31–33. He specifically alleges that Defendants failed "to comply with the 1991 ADA Accessibility Guidelines and/or the 2010 ADA Standards for Accessible Design." *Id.* ¶ 14. To prevail on his Title III design claim, Hernandez must show that (1) he is disabled within the meaning of the ADA; (2) Defendants are a private entity that owns, leases, or operates a place of public accommodation; and (3) Hernandez was denied public accommodations by Defendants because of his disability. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007). The parties only dispute whether Hernandez was denied public accommodations by Defendants because of his disability.

Title III states, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Discrimination includes "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable." *Id.* § 12182(b)(2)(A)(iv). "To ensure compliance with these mandates, a federal agency called the Architectural and Transportation Barriers Compliance Board ('Access Board') produces the" Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities ("ADAAG"). *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1177 (9th Cir. 2017). The "Access Board sets a baseline of nonbinding requirements" and the Department of Justice ("DOJ") "must then adopt binding regulations that are consistent with—but not necessarily identical to—the [Access] Board's guidelines." *Id.* (internal quotation marks and citation omitted). On July 26, 1991 the Access Board published its first version of the ADAAG ("1991 ADAAG Standards") and the DOJ adopted them on the same day. *Id.*; *see* 28 C.F.R. Pt. 36. In 2004, the Access Board updated the ADAAG and in 2010, the "DOJ updated its accessibility regulations by incorporating the 2004 ADAAG standards with slight variations" ("2010 ADAAG

5

Standards"). *Id.*; *see* 36 C.F.R. Pt. 1191, App'x B, D.

Newly constructed or altered facilities before September 15, 2010, can choose to comply with either the original 1991 ADAAG Standards or another set of federal standards, the Uniform Federal Accessibility Standards ("UFAS"). 28 C.F.R. § 35.151(c)(1). New constructions or alterations that commenced between September 15, 2010, and March 15, 2012, can comply with the 1991 ADAAG Standards, UFAS, or the 2010 ADAAG Standards. *Id.* § 35.151(c)(2). And new constructions or alterations that commenced after March 15, 2012, must comply with the 2010 ADAAG standards. *Id.* § 35.151(c)(3). In this case, because it is unclear when the Facility was constructed or altered, the Court will consider both the 1991 and 2010 ADAAG Standards.

The parties do not dispute that public accommodations, *i.e.*, accessible parking spaces or passenger loading zones, are only required if Defendants have parking spaces or passenger loading zones in the first place. The ADA only requires parking spaces or passenger loading zones to comply with the 1991 and 2010 ADAAG Standards where they are provided. The 2010 ADAAG Standards state that, "[w]here parking spaces are provided" they must comply with the ADAAG. 36 C.F.R. Pt. 1191, App'x B, § 208.1. It also recites, "[w]here provided, passenger loading zones shall be provided in accordance with" the ADAAG. *Id.* § 209.2. Likewise, the 1991 ADAAG Standards recite, "[i]f parking spaces are provided for self-parking by employees or visitors, or both, then accessible spaces complying with [the guidelines] shall be provided in each such parking area" and "[i]f passenger loading zones are provided, then at least one passenger loading zone shall comply with the guidelines." 28 C.F.R. Pt. 36, App'x A § 4.1.2(5)(a), (d). Therefore, the key questions are whether the Facility has parking spaces or passenger loading zones, and if not, whether the Facility is affirmatively required to provide parking spaces or passenger loading zones.

    a. <u>The Facility Does Not Have Parking Spaces or a Passenger Loading Zone</u>

First, there is no genuine dispute that the Facility does not have parking spaces or a passenger loading zone. The Court takes judicial notice of two similar Google Maps Street View images of the Facility in March 2021, a month before Hernandez visited the Facility. Docket No. 24-3 ("Defendants' RJN, Ex. 1"); Docket No. 24-4 ("Defendants' RJN, Ex. 2"); *see* Fed. R. Evid.

6

1   201(b); *see also Lammey v. Queenbee LLC*, 2019 WL 7050221, at *1 n.2 (C.D. Cal. Dec. 20,
2   2019), *appeal dismissed,* 2020 WL 1488769 (9th Cir. Feb. 28, 2020) (granting request for judicial
3   notice of Google Maps images of the real property).  The Court also takes judicial notice of four
4   similar Google Street View images from January 2018, September 2018, April 2019, and
5   November 2020.  Docket Nos. 25-3 ("Hernandez RJN") at 1–10 ("Exs. 1–4").  The images from
6   March 2021, January 2018, and November 2020 are copied below:







Defendants' RJN, Ex.1; Hernandez RJN, Exs. 1, 4.

       Hernandez alleges that during his visit, he "found a parking lot, with several parked vehicles near the Facility entrance." FAC ¶ 10.  But these images do not show any parking lot at the Facility.[3]  Instead, they show "that there is only one area for cars to enter and exit the Facility—a paved surface that the Hernandez himself refers to as a 'driveway' in his FAC and his Opposition."  Reply at 2; *see* FAC ¶ 10 (alleging that "[h]e had to unload from his vehicle while parked in the *driveway*.") (emphasis added).  Defendants explain that the paved surface is a driveway for cars to be brought in or out of the service bays and is not used for customer parking.  Marey Depo. at 9; Cayabyab Depo. at 21, 23.  Caliber's Regional and General Managers testified that the "right side of the Facility's driveway is for vehicles that are in phases of repair, such as preparing to go into the paint process, preparing to go to the body process, or waiting for parts in the reassembly process."  Marey Depo. at 9–10; Cayabyab Depo. at 13, 24, 27.  Caliber employees

---

[3] During the hearing, Hernandez asserted for the first time that the fenced parking lot on the right side of the Facility could be the Facility's parking lot.  But according to the March 2021 Google Street View image, there is a sign on the fence that states a different address and name: "125 California Drive, Jason the Car Guy, We Sell, Buy, Consign, and Welcome All Trade-Ins."  Thus, there is no genuine dispute that the fenced parking lot is not the Facility's parking lot.

1  park the cars on the right side of the driveway as they await the next repair phase and then they are
2  moved in and out of the shop.  Marey Depo. at 10; Cayabyab Depo. at 20–21.  Caliber also keeps
3  the cars on the right side of the driveway so a tow truck has easy access to pick up a car after the
4  insurance company determines that the car is a total loss.  Cayabyab Depo. at 13–14.
5     Hernandez contends that his photograph of the Facility on the day of his visit and the
6  observations made by his private investigators refute the managers' testimonies and confirm that
7  customers do park in defendants' driveway.  Docket No. 42 at 4.  Hernandez points to Cayabyab's
8  testimony, who did not know who had parked the cars on the right side of the driveway in
9  Hernandez's photograph, even though he had testified that only employees park on the right side
10 of the driveway.  *Id.* at 4–5.  The photograph is copied below:



27 Docket No. 42-4.  But the fact that Cayabyab did not have personal knowledge of who parked
28 those cars on the day of Hernandez's visit does not undermine Cayabyab's testimony that there is

9

no customer parking on the right side of the driveway. This is especially true because he is not the only one who moves the cars to the right side of the driveway; the service estimator also moves the cars. Cayabyab Depo. at 23. Hernandez also points out that Cayabyab testified that one of the vehicles in Hernandez's photograph was parked in the opposite direction from how a total loss vehicle would have been parked, even though Cayabyab had testified that cars parked on the right side were total loss vehicles waiting to be picked up by a tow truck. Docket No. 42 at 4–5; *see* Cayabyab Depo. at 11, 13–14, 18–19. This is not inconsistent, however, because Cayabyab also testified that vehicles waiting for different phases of repair were also parked on the right side of the driveway. *Id.* at 13, 24, 27.

Furthermore, the declarations of Hernandez's private investigators do not dispute the fact that the right side of the driveway is not for customer parking. One private investigator, Robert Ferris, surveilled the Facility on January 24, 2022, and observed that the "paved area was large enough for nine vehicles to park, three in each lane" with three lanes going left to right as viewed from the street. Ferris Decl. ¶ 4. Ferris observed a customer who parked "at an angle, taking up space in both the left and middle lanes" and a Facility employee who "conducted an estimate on the vehicle while it was parked in the same location." *Id.* ¶ 6. He then "observed Facility employees moving vehicles until all three lanes of the paved area were full." *Id.* ¶ 7. When customers arrived and had no space "to park in the paved area, [they] parked their vehicles either in the street directly in front of the driveway or at the curb farther down the street." *Id.* Ferris's declaration is consistent with the Defendants' testimonies that there are no spaces used for customer parking on the driveway and that employees rearrange the cars on the driveway.

Similarly, the second private investigator, Fred Kim, conducted surveillance on February 23, 2022 and observed one customer who parked in the left lane, went into the office, and returned with an employee who walked around the vehicle to examine damages. Kim Decl. ¶ 10. After the employee conducted the estimate, the customer drove away. *Id.* That same day, Kim observed another customer who arrived to pick up her vehicle, which was parked in the right lane. *Id.* ¶ 11. On March 1, 2022, Kim arrived at the Facility to obtain an estimate for repairs to a vehicle. *Id.* ¶ 3. When he arrived at the Facility, he parked in the middle lane because the right and left lanes

were occupied. *Id.* ¶ 4. A Facility employee confirmed that he could park there. *Id.* Kim exited the vehicle and unloaded his manual wheelchair. *Id.* ¶ 5. During the estimate, a Facility employee brought him to the rear, front, and left side of the vehicle to examine damages but not the right side because there was not enough space for his wheelchair. *Id.* ¶ 6. Again, Kim's declaration is consistent with the managers' testimonies that there are no spaces used for customer parking.

Therefore, there is no genuine dispute that the Facility does not have a parking lot or parking spaces. It only has a driveway. Neither the 1991 nor the 2010 ADAAG Standards have design guidelines for driveways. *See* 28 C.F.R. Pt. 36, App'x A; 36 C.F.R. Pt. 1191, App'x B, D. In addition, the ADAAG Standards make clear that driveways are distinguished from parking lots. The 1991 ADAAG Standards define a "Vehicular Way" as "[a] route intended for vehicular traffic, such as a street, *driveway*, or *parking lot*." 28 C.F.R. Pt. 36, App'x A, § 3.5 (emphasis added). Moreover, according to the 1991 Standards, a parking lot needs at least one parking space *See, e.g.*, *id.* § 4.1.2(5)(a). Likewise, the 2010 ADAAG Standards define "Vehicular Way" as "[a] route provided for vehicular traffic, such as in a street, *driveway*, or *parking facility*." 36 C.F.R. Pt. 1191, App'x B, § 106.5 (emphasis added), thus distinguishing a driveway from a parking facility. Thus, any ADAAG standards that apply to driveways do not apply to parking. The Facility is not subject to the ADAAG Standards because it does not provide parking and there are no design guidelines for driveways.

As for whether there is a passenger loading zone, the Google Street View images do not show any passenger loading zone. In contrast to his allegation about seeing a parking lot, Hernandez does not allege that he saw any passenger loading zone at the Facility. *See* FAC ¶ 10. In his supplemental brief, Hernandez argues that because "customers regularly load and unload from their vehicles" on the paved surface, the driveway is a passenger loading zone. Docket No. 42 at 7. But under the ADAAG Standards, a driveway itself cannot be a passenger loading zone. The 2010 ADAAG Standards distinguish passenger loading zones and driveways by stating that "[p]assenger loading zones shall provide access aisles . . . adjacent to the vehicle pull-up space," and that "[a]ccess aisles . . . shall not overlap the vehicular way," *e.g.*, driveways. 36 C.F.R. Pt. 1191, App'x B, § 503.3. The space Hernandez described is a driveway, not a passenger loading

11

zone. Therefore, there is no genuine dispute that the Facility does not have a passenger loading zone.

Several courts have held that failure to show that a defendant provided public parking constituted a failure to prove a violation of Title III due to lack of accessible parking. *See, e.g.*, *Love v. Kardooni*, No. 19-CV-4706-MMC, Docket No. 67, 2–3 (N.D. Cal. Mar. 18, 2021) (granting summary judgment because plaintiff did not dispute that the ADA does not require a business to offer accessible parking and did not dispute that the defendants did not offer parking of any kind on its premises nor that their business is one of the three types required to have a passenger loading zone). The Central District of California has repeatedly denied motions for default judgment where the plaintiffs had failed to establish that the defendants provided public parking. *See, e.g.*, *Grigsby v. Tecomate Corp.*, 2021 WL 134583, at *1, *3 (C.D. Cal. Jan. 14, 2021) (denying motion for default judgment on a Title III claim because plaintiffs' allegations failed to "demonstrate that [the defendant] provides parking to its customers, such that the lack of accessible parking would constitute an architectural barrier under the ADA"); *Bailey v. HVSN Enterprises Inc*, 2021 WL 794501, at *1–2 (C.D. Cal. Mar. 2, 2021) (denying motion for default judgment because plaintiff had alleged that the defendant failed to provide wheelchair accessible parking in violation of the ADA but the plaintiff had failed to establish that the defendant "actually provides public parking"); *Holland v. Lanksherman Plaza, LLC*, 2021 WL 2808694, at *1–3 (C.D. Cal. July 6, 2021) (denying motion for default judgment on Title III claim because plaintiff "fail[ed] to establish the existence of architectural barriers at Defendant's" restaurant/liquor store because he "allege[d] two violations related to parking spaces without first establishing that Defendant provides parking to the public").

Likewise, in this case, the fact that there is no parking lot or a passenger loading zone at the Facility undermines Hernandez's claim.

          b.      <u>There Is No Legal Requirement to Provide a Parking Space or Passenger Loading Zone</u>

Furthermore, the Facility is not legally required to have parking spaces or passenger loading zones, and therefore the Facility is not subject to the ADAAG Standards. Hernandez does

1    not dispute that the ADA does not require Defendants to provide a parking facility or parking

2    spaces.  *See infra* Part III.A.1.  And although he asserts that the Facility is required to provide a

3    passenger loading zone under the ADAAG Standards, his argument fails.

4          Under the 2010 ADAAG Standards, only three types of facilities are required to have

5    passenger loading zones:  "licensed medical care and licensed long-term care facilities where the

6    period of stay exceeds twenty-four hours," "[p]arking facilities that provide valet parking

7    services," and "[m]echanical access parking garages."  36 C.F.R. Pt. 1191, App'x B §§ 209.3,

8    209.4, 209.5.  Under the 1991 ADAAG Standards, only valet parking facilities are required to

9    provide a passenger loading zone.  28 C.F.R. Pt. 36, App'x A § 4.1.2.(5)(e).  In his supplemental

10    brief, Hernandez alleges that the Facility provides valet parking services and is therefore obligated

11    to have a passenger loading zone.  Docket No. 42 at 9.  In Hernandez's view, an auto body service

12    requires the same conduct as a valet parking service—"one must deliver their vehicle there and

13    unload from it in order to obtain the services offered."  *Id.*  Hernandez does not allege this in his

14    FAC.  In any event, his argument is meritless because as established above, the Facility does not

15    provide parking.  *See infra* Part III.A.1.a.  The Facility is not a "parking facility that provides valet

16    parking services."  36 C.F.R. Pt. 1191, App'x B § 209.4.  Therefore, Defendants are not legally

17    required to provide a passenger loading zone.

18          Hernandez also contends that Defendants are required to provide parking because the

19    Burlingame Municipal Code Title 25 ("Zoning Ordinance") requires that Defendants provide

20    parking.  Opp. at 4.  The city of Burlingame amended the Zoning Ordinance on December 6, 2021.

21    The parties agree that the Zoning Ordinance before the December 2021 amendments (the "Prior

22    Zoning Ordinance") applies in this case because Hernandez visited the Facility in April 2021.[4]

23    The Prior Zoning Ordinance required that "[a]t the time of erection of any building or structure, or

24    at the time any building or structure is enlarged or increased in capacity, there shall be provided

25    off-street parking spaces with adequate and proper provision for ingress and egress by standard

26    size automobiles."  Prior Zoning Ordinance § 25.70.010.  But Hernandez does not allege that the

---

[4] For this reason, the Court will not address any arguments about the current Zoning Ordinance.

Facility was erected, enlarged, or increased in capacity when the Prior Zoning Ordinance was in effect. Therefore, the Prior Zoning Ordinance did not require the Facility to have parking.

Accordingly, Hernandez's Title III claim that Defendants violate the ADA due to the lack of accessible parking or an accessible passenger loading zone fails. Defendants provide neither and are not legally required to provide either. Instead they provide a driveway, which is not subject to any design guidelines and is distinct from a parking lot or a passenger loading zone under the ADA. The Court **GRANTS** Defendants' motion for summary judgment on Hernandez's design-based Title III claim.

2. <u>No Failure to Modify Defendants' Policies and Practices in Violation of the ADA</u>

Hernandez also contends that Defendants violated the ADA by failing to "modify existing policies and procedures when necessary to afford its facility, goods, services, or accommodations to individuals with disabilities." FAC ¶¶ 29–30. Under the ADA, discrimination also includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." *Id.* § 12182(b)(2)(A)(ii). As opposed to the "design" claims above, these are "use" or "use of the design" claims.

In his original briefing, Hernandez did not elaborate on what policies or practices Defendants failed to modify. At best, he vaguely contended that Defendants have a "reoccurring" practice of parking its company truck in the street parking space directly in front of the Facility, which prevents disabled customers from parking close to the Facility on the street. *Id.* at 6; *see, e.g.*, Hernandez RJN, Ex. 2. But Hernandez's own evidence—all of his Google Maps Street View images—show non-Caliber vehicles parked in the space in front of the Facility. *See* Hernandez RJN, Exs. 1, 3, 4. In fact, Hernandez alleges that during his visit "[t]he street in front of the Facility was busy and full of *parked cars*"; he does not say anything about Defendants' vehicle. FAC ¶ 10 (emphasis added). Moreover, he does not explain how Defendants would be able to prevent others from parking in the public street space in front of the Facility. Nor does he assert

14

that any of the other public street spaces are inaccessible. Reply at 7.

In his supplemental brief, Hernandez asserts that Defendants' *use* of the paved area as a loading area for able-bodied customers violates the ADA because if Defendants use the paved area as a loading zone, it should comply with loading zone accessibility requirements. Docket No. 42 at 7. But as established above, the Facility's driveway is not a passenger loading zone as defined by the ADAAG Standards. *See supra* Part III.A.1.a. That customers sometimes use the driveway to unload while dropping the car off does not trigger otherwise inapplicable ADAAG standards.

Further, Hernandez's reliance on *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004) and *Kalani v. Starbucks Corp.*, 117 F. Supp. 3d 1078 (N.D. Cal. 2015), *vacated in part on other grounds*, *Kalani v. Starbucks Coffee Co.*, 698 F. App'x 883, 887 (9th Cir. 2017) is misplaced. In *Fortyune*, the defendant theater provided seating for the companions of disabled customers next to the wheelchair spaces. *Fortyune*, 364 F.3d at 1078. But the theater also had a policy of allowing able-bodied customers to sit in these companion seats when a movie was sold out. *Id.* at 1079. The Ninth Circuit held that even though the theater complied with the design requirements of the ADA because it had companion seats for disabled customers, its use of the design—*i.e.*, its policy of allowing able-bodied customers to use the companion seats during sold-out movies—violated the ADA. *Id.* at 1085. Similarly, in *Kalani*, a court in this district relied on *Fortyune*, to hold that the plaintiff asserted a valid Title III "use" claim when he alleged that defendant Starbucks had prevented his full and equal enjoyment of the goods and services because it had arranged the accessible tables in a way that forced the plaintiff to sit facing the wall. *Kalani*, 117 F.Supp.3d at 1086–88. The plaintiff alleged that other able-bodied patrons were able to enjoy the Starbucks environment by sitting with their backs against the wall. *Id.* at 1087. The court held that defendant's "orientation and positioning of its interior accessible tables" constituted discrimination under Title III of the ADA. *Id.* at 1088. But these cases are distinguishable because they involved a use that defeated an ADA required design. Here, there is no ADA design requiring accessible parking spaces.

Courts have rejected attempts to reframe a "design" claim based on an alleged failure to comply with accessible design standards to a "use" claim for failure to modify policies and

practices. For example, in *Colorado Cross Disability Coalition. v. Abercrombie & Fitch Co.*, 765 F.3d 1205 (10th Cir. 2014), the Tenth Circuit held that the plaintiffs' "use" claim was in actuality a "design" claim and because the challenged designs satisfied the ADAAG Standards, the court concluded that the Defendant did not violate Title III of the ADA. *Colorado*, 765 F.3d at 1220, 1224–25. At issue were defendant Abercrombie's raised porches at the central entrance of its stores. *Id.* at 1208. The Tenth Circuit concluded that the porches did not violate the ADAAG Standards because there was no requirement that the porch itself be accessible when on either side of the porch entrance there were accessible entrances that were level with the mall floors. *Id.* at 1223–25. Plaintiffs asserted that it was not the design of the porches but Abercrombie's use of the porch as the "central feature of the Hollister experience" that violated the ADA. *Id.* at 1219. The court rejected this argument and held that it was "not dealing with a public accommodation's use of a design (*e.g.*, a distinct policy or practice concerning to whom an accommodation is available, when an accommodation is available, or what choice of accommodations is available), but rather the design itself (*i.e.*, the form and shape of a structure that render it inaccessible)." *Id.* at 1220. The court distinguished the Ninth Circuit's decision in *Fortyune* where the issue was a discriminatory policy; apart from the porch's existence, Abercrombie did not "use" the porch at all. *Id.* Instead it was the porch's design that denied disabled persons access to the store through the central entrance and because the design complied with the ADAAG Standards, there was no ADA violation. *Id.* at 1223–25. *Cf. Whitaker v. Franklin Plaza LLC*, 2021 WL 4353240, at *1–2, *4–5 (C.D. Cal. Aug. 6, 2021) (rejecting plaintiff's argument that defendant's failure to provide an "accessible alternative" amounted to an ADA violation even though the defendant's dining surfaces did not violate the ADAAG because the plaintiff had "identified only a design element . . . rather than a policy regarding the *use* of the dining surfaces" and therefore "the ADAAG requirements are controlling.").

Furthermore, Defendants' use of the driveway is not discriminatory. Hernandez asserts in his supplemental brief that "as a wheelchair user, he cannot access the Facility's services in the same way able-bodied patrons do, by hopping out of his vehicle in the driveway or street and

16

walking around all sides of it to obtain an estimate."[5] Docket No. 42. But this statement directly contradicts his FAC where he admits that he was able to unload from the driveway. His only complaint was that "[h]e had to unload from his vehicle while parked in the driveway, which made him feel rushed as he did not know whether other cars might come in or out of the driveway." FAC ¶ 10. But as observed by Hernandez's private investigators, this is the same experience that any other customer has, including able-bodied customers. Ferris Decl. ¶¶ 6–7; Kim Decl. ¶¶ 4–5, 10. Hernandez also does not allege in his FAC that he was unable to see all sides of his vehicle when he obtained his estimate.[6] Instead, he claims that the "staff came over to [him] and took his keys, taking the vehicle in for inspection for approximately 45 minutes." FAC ¶ 10. He does not allege that his estimate was incorrect or that the services he received were deficient. He only asserts that he "is denied full and equal access to the Facility's goods and services by Defendants' failure to provide an accessible means for him to get his vehicle to the Facility for service." Docket No. 42 at 10. But nothing shows he was deprived of the service he sought.

Finally, during the motion hearing and in his supplemental brief, Hernandez asserts that Defendants have failed to "modify its policies and practices to ensure that disabled customers are afforded access to its goods and services" because Defendants failed to have policies like "pick[ing] up vehicles from another location, such as the customer's home or the nearby public train station." Docket No. 42 at 3–4. But Hernandez, despite a number of opportunities, fails to cite any authority that requires the Facility to provide such services. *See generally* Docket Nos. 28, 42.

---

[5] Hernandez also asserts that Defendants make their services unavailable to wheelchair-bound patrons because it is unclear how patrons are meant to "drop by" for an estimate, as Caliber's website states, if no parking or passenger loading area is available at the Facility. Opp. at 5. But the undisputed fact that the Facility has a driveway, where wheelchair-bound and able-bodied patrons are able to receive estimates, contradicts Hernandez's argument.

Hernandez requests the Court to take judicial notice of Caliber's website, specifically the statement that potential customers may "[c]all us, drop by or go online to schedule an appointment." Hernandez RJN, at 1–2. Defendants do not oppose. Because the website is publicly available, the Court **GRANTS** Hernandez's request. Fed. R. Evid. 201.

[6] Hernandez's new theory of liability appears to be based on Kim's declaration. Kim Decl. ¶ 7. But Hernandez does not argue that being unable to see all four sides of his vehicle during an estimate for repair denies him full and equal access to the Facility's goods and services.

1  Accordingly, Hernandez's ADA claim based on Defendants' alleged failure to modify its

2 practices and policies fails. The Court **GRANTS** Defendants' motion for summary judgment on

3 Hernandez's Title III claim.

B. <u>The Unruh Act and the California Health and Safety Code</u>

Hernandez's state law claims under the Unruh Act and the California Health and Safety Code fail for the same reasons that his ADA claim fails.[7] Neither statute requires Defendants to have a parking facility or passenger loading zone.

The Unruh Act does "not require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, alteration, repair, or modification that is otherwise required by *other provisions of law*, to any new or existing establishment, facility, building, improvement, or any other structure . . . . " Cal. Civ. Code § 51(d) (emphasis added). Similarly, the California Health and Safety Code does not require public accommodations to have parking spaces or passenger loading zones open to the public. The purpose of the statute is to adhere to the provisions of Government Code Section 4450, which requires amendments to the California Building Code ("CBC"), Part 2 of Title 24 of the California Code of Regulations, "that would ensure California's building standards for disability access in commercial occupancies are consistent with" certain federal regulations. Cal. Health & Safety Code § 19955(a); Cal. Gov't Code § 4450 (c), (d). As with Title III, the CBC states that "[w]here parking spaces are provided" they must comply with the CBC and "[w]here provided, passenger drop-off and loading zones shall comply with" the CBC. Cal. Code Regs. tit. 24, §§ 11B-208.1, 11B-209.2. Furthermore, as with Title III, the CBC distinguishes parking facilities and passenger loading zones from driveways. Cal Bldg. Code § 202 (defining "vehicular way" as "[a] route provided for vehicular traffic, such as in a street, driveway, or parking facility"); Cal. Code Regs. tit. 24, § 11B-503.3 (stating that "[p]assenger drop-off and loading zones shall provide access

---

[7] Hernandez requests that the Court exercise supplemental jurisdiction of his state law claims. Opp. at 2 n.2. Federal courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Because the state law claims form part of the same case or controversy as the ADA claim, the Court exercises supplemental jurisdiction of the state law claims.

aisles" and "access aisles . . . shall not overlap the vehicular way").

Hernandez does not address his state claims separately from his ADA claim. Opp. at 2 n.2. Accordingly, as with the ADA claim, because the Unruh Act and the California Health and Safety Code do not require Defendants to provide a parking facility or a passenger loading zone. Because Defendants have neither, the Court **GRANTS** Defendants' motion for summary judgment on Hernandez's state law claims.

## IV. CONCLUSION

For the reasons explained above, the Court **GRANTS** Defendants' motion for summary judgment.

This order disposes of Docket No. 24. The Clerk of Court is instructed to enter Judgment and close the case.

**IT IS SO ORDERED**.

Dated: April 4, 2022

_____
EDWARD M. CHEN
United States District Judge

19